# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| ACCELERANCE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 3:24-cv-00806-GCM |
| APP SOLUTIONS INTERNATIONAL, INC., | ) | |
| d/b/a APPLAUDO STUDIOS, a/k/a | ) | **JURY TRIAL DEMANDED** |
| APPLAUDO, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF ACCELERANCE, INC.'S AMENDED COMPLAINT

Accelerance, Inc. ("Plaintiff"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 15(a)(1)(B), for its Amended Complaint against App Solutions International, Inc., d/b/a Applaudo Studios, a/k/a Applaudo ("Defendant," collectively, with Plaintiff, "the Parties") states and alleges:

### INTRODUCTION

1.     This case arises from Defendant's knowing and deliberate breach of a professional services agreement between Plaintiff and Defendant entitled "Professional Services Agreement to create an Outsourced Sales Channel with Membership in the Accelerance Certified Expert Partner Network," with an effective date of December 1, 2018 (the "Agreement"), as modified by the "Professional Services Agreement – Addendum" (the "Addendum").[1]

2.     Through this action, Plaintiff seeks to recover damages, costs, and contractual attorneys' fees incurred as a result of Defendant's actual and anticipated breaches of this contract,

---

[1] True and correct copies of the Agreement and Addendum are attached hereto as ***Exhibit 1*** and ***Exhibit 2***, respectively, and are incorporated by reference herein.

as well as a declaration clarifying the Parties' respective obligations under the Agreement, as modified by the Addendum (collectively, the "Operative Agreement").

## PARTIES

3.      Plaintiff adopts and incorporates by reference the facts and allegations set forth in the preceding paragraphs as if fully set forth herein.

4.      Plaintiff Accelerance, Inc. is a California corporation, with its principal place of business in San Mateo County, California. Plaintiff is registered and authorized to conduct business in the State of North Carolina, with its registered office in Raleigh, North Carolina.

5.      Defendant App Solutions International, Inc., d/b/a Applaudo Studios, a/k/a Applaudo is a Panamanian corporation with a principal place of business in San Salvador, El Salvador.

## JURISDICTION AND VENUE

6.      Plaintiff adopts and incorporates by reference the facts and allegations set forth in the preceding paragraphs as if fully set forth herein.

7.      This Court has subject matter jurisdiction over this case because there is complete diversity between the Parties and the amount in controversy includes amounts currently owing under the Operative Agreement exceeding $75,000.00, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a).

8.      Venue is proper in this Judicial District because Defendant does business in this Judicial District and/or because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District. *See* 28 U.S.C. § 1391.

9.      Venue and jurisdiction are further appropriate as the Agreement between the Parties contains valid choice of law, forum selection, and consent to jurisdiction provisions providing: (1) that the contract would be construed and enforced under North Carolina law; (2) that any action

maintained by the Parties to the Agreement shall be commenced solely within the state and federal courts located in Charlotte, North Carolina; and (3) waiver of any defense of lack of personal jurisdiction, improper venue, and forum *non conveniens*. (*See **Exhibit 1***, Agreement at ¶ 15).

## FACTUAL BACKGROUND

10.     Plaintiff adopts and incorporates by reference the facts and allegations set forth in the preceding paragraphs as if fully set forth herein.

11.     Plaintiff is a service and solutions provider in the technology, software, and cybersecurity industry.

12.     Plaintiff contracts with other tech companies (the "Software Developer(s)") to attract, nurture, and coordinate opportunities with prospective clients.

13.     Plaintiff receives commissions from the Software Developers for presenting these opportunities and assisting the Software Developers in developing long-term working relationships with the clients.

14.     Defendant is one such Software Developer for Plaintiff.

## I.     THE AGREEMENT

15.     Plaintiff adopts and incorporates by reference the facts and allegations set forth in the preceding paragraphs as if fully set forth herein.

16.     As noted above, the Parties entered into the Agreement, effective December 1, 2018. It was executed by Scott Kenyon, Defendant's Chief Executive Officer, and Andy Hilliard, Plaintiff's President.

17.     The Agreement represents a valid contract between the Parties supported by mutual consideration as discussed below.

18.     Beginning with the Agreement and running through the current Operative Agreement, Plaintiff contracted to provide Defendant with "Qualified Opportunities" during each term of the Agreement.

19.     The Operative Agreement defines "Qualified Opportunities," in pertinent part, as: "the identification of prospective clients ('Clients') introduced by [Plaintiff] and accepted by [Defendant] based on mutually agreed upon target profiles as may be modified from time-to-time by the [P]arties, which also includes the identification and/or introduction of third-party software developers and other service providers, as well as their respective Clients to [Defendant]." (*See Exhibit 1*, Agreement at ¶ 1). Additional services were provided by Plaintiff to Defendant as set forth in Exhibit A to the Agreement. (*See id.* at Exhibit A).

20.      Under the Operative Agreement, Plaintiff is not required to exclusively provide or guarantee a set number of Qualified Opportunities to Defendant. Instead, Defendant would only owe commissions for those Qualified Opportunities/Clients presented by Plaintiff to Defendant.

21.     Under the Agreement, whenever Plaintiff introduced a Qualified Opportunity to Defendant, thirteen percent (13%) of any and all revenue generated by the Defendant from that Client was to be paid to Plaintiff for thirty-six (36) "Billing Cycles," defined as "monthly periods in which revenue is generated and billed." (*See Exhibit 1*, Agreement at ¶ 3(b)).

22.     For purposes of the Agreement, a monthly period in which no revenue is generated is not considered a Billing Cycle. In instances where work starts for a Qualified Opportunity/Client after the first business day of the month, the first Billing Cycle will be deemed to be the partial month, plus the first full month. (*See Exhibit 1*, Agreement at ¶ 3(b)).

23.     Under the Agreement, commissions were due to Plaintiff within thirty (30) days after receipt of payment by Defendant from each Client introduced to Defendant by Plaintiff. (*See Exhibit 1*, Agreement at ¶ 3(b)).

24.     The initial term of the Agreement ended on December 1, 2019. Thereafter, the Agreement "automatically renew[ed] for additional one (1) year terms (each a 'Renewal Term') under the same terms and conditions[.]" (*See Exhibit 1*, Agreement at ¶ 4).

25.     This automatic renewal continued unless and until otherwise agreed upon in writing by both Parties, or in the event either party terminates the Agreement with thirty (30) days written notice. (*See Exhibit 1*, Agreement at ¶ 4).

26.     Section 6 of the Agreement, which was subsequently made part of the Operative Agreement between the Parties, additionally provides: "No termination of this Agreement will relieve [Defendant] of any liability for monetary sums owing to [Plaintiff,]" further providing that, "Paragraphs 3 and 8 through 17 shall survive the termination of this Agreement." (*See Exhibit 1*, Agreement at ¶ 6).

27.     Section 16 of the Agreement provides the following:

**Non-[C]ircumvention and Non-Solicitation.** [Defendant] agrees that it and any of its affiliated companies, known or unknown, successors in interest or assigns will not, either during or after the termination of their relationship or during or after the term of this Agreement for three (3) years following such termination, enter into any agreement, association or partnership with any Qualified Opportunity, for the purpose of developing any business opportunities, without the express written permission of [Plaintiff]. [Defendant] agrees and understands that any overt or covert action of circumvention, including but not limited to: (a) contacting or attempting to contact the Qualified Opportunities outside of the terms of this Agreement; or (b) otherwise making use of the Confidential Information provided to it without written permission from Accelerance other than in the ordinary course of the business contemplated under this Agreement between the parties hereto, shall constitute a default of this Agreement for which the party may seek relief in a state or federal courts of North Carolina located in Charlotte, North Carolina, including but not limited to injunctive relief. The [Defendant] will pay the amounts set forth

in Sections 3(b) if, at any time within th[r]ee (3) years after the termination of this Agreement, a Qualified Opportunity engages with [Defendant].

(*Exhibit 1*, Agreement at ¶ 16).

28.    As such, if Defendant were to breach the contract by failing to pay commissions due and owing under the Operative Agreement, Plaintiff would be entitled to obtain injunctive relief in the form of an order prohibiting Defendant from continuing to do business with the Qualified Opportunities.[2]

## II.    THE ADDENDUM

29.    Plaintiff adopts and incorporates by reference the facts and allegations set forth in the preceding paragraphs as if fully set forth herein.

30.    During the course of the Agreement, Plaintiff recognized that certain Qualified Opportunity/Client relationships were extending well beyond thirty-six (36) Billing Cycles, and Plaintiff was not receiving value for the valuable services and Client contacts it provided Software Developers, like Defendant.

31.    To that end, Plaintiff offered Defendant a limited modification of the Agreement's terms, extending the commission amounts and period to account for these valuable, long-term Clients, while providing Defendant continued access to Qualified Opportunities and exclusion of certain expenses for purposes of calculating the amount of Defendant's commission payments to Plaintiff.

32.    Plaintiff was under no obligation to submit new Qualified Opportunities to Defendant at the time it proposed the Addendum.

---

[2] Plaintiff notes that such injunctive relief would be available even if there were an enforceable limitation on the monetary damages otherwise available.

33.     Plaintiff communicated its intent to discontinue the submission of new Qualified Opportunities to Defendant if Defendant was unwilling to proceed under the newly proposed terms with regard to those new Qualified Opportunities.

34.     On or about July 26, 2020, Defendant accepted Plaintiff's proposed modification to the Agreement, with the Parties executing the Addendum. (*See Exhibit 2*, Addendum at p.1).

35.     The Addendum represents a valid contract/contractual modification between the Parties supported by mutual consideration as set forth below.

36.     In relevant part, the Addendum deleted and replaced Section 3(b) of the Agreement addressing commissions to be paid to Plaintiff by Defendant with the following language:

Commissions Paid by Software Developer to Accelerance.

Commission 1. If [Plaintiff] introduces a Qualified Opportunity to [Defendant], the Parties will agree to a commission between 15% to 20% of any and all revenue generated by the [Defendant], to be paid to [Plaintiff] by [Defendant] for the duration of the relationship between [Defendant] and Qualified Opportunity. The agreed upon commission percentage for each new Qualified Opportunity will be mutually confirmed in writing by both Parties through an additional addendum to the Services Agreement, which shall be entitled the Professional Services Agreement Commission Addendum.

Reimbursable costs such as travel expenses, applicable software licenses and tools costs transferred to the [Defendant], or per diem, which is transferred to the [Defendant's] employees are excluded from commission calculations. Payment of the commission to [Plaintiff] will be due within 15 days after receipt of payment by [Defendant] from each Qualified Opportunity introduced to [Defendant] by [Plaintiff].

(*See Exhibit 2*, Addendum at ¶ 1).

37.     The deletion of the Agreement's Section 3(b) eliminated both the definition and use of thirty-six (36) month Billing Cycles relative to Qualified Opportunities/Clients.

38.     The new language of Section 3 in the Addendum provided that, in exchange for Plaintiff's continuing to provide new Qualified Opportunities to Defendant, Defendant would pay Plaintiff a commission of at least fifteen percent (15%) of any and all revenue generated by Defendant from any Qualified Opportunities, to be paid to Plaintiff for the entire duration of the relationship between Defendant and any Qualified Opportunity/Client. (*See Exhibit 2*, Addendum at ¶ 3).

39.     The Addendum further permitted Defendant to now exclude certain reimbursable costs from the revenue figures upon which its commission obligations are based, "such as travel expenses, applicable software licenses and tools costs transferred to the [Defendant], or per diem transferred to [Defendant's] employees." (*See Exhibit 2*, Addendum at ¶ 1).

40.     Following execution of the Addendum, Defendant did not pay commissions on certain reimbursable costs, including travel expenses and *per diem* provided to Defendant's employees.

41.     In addition, the Addendum provided that commission payments to Plaintiff were now due within fifteen (15) days after receipt of payment by Defendant from any Client/Qualified Opportunity. (*See Exhibit 2*, Addendum at ¶ 3).

42.     Section 3 of the Addendum provides the following:

> All other provisions of the Services Agreement remain in full force and effect unless a provision conflicts with the terms and/or spirit of this Addendum. To the extent this Addendum and the Services Agreement conflict, the latter is hereby amended appropriately to be consistent with this Addendum.

(*See Exhibit 2*, Addendum at ¶ 3).

43.     Any limitation on the amount of commissions recoverable by Plaintiff in the Agreement conflicts with the spirit of the Addendum was amended or omitted entirely in order to effect the Parties' intent.

## III.   THE DISPUTE AND SUBSEQUENT NEGOTIATIONS

44.     Plaintiff adopts and incorporates by reference the facts and allegations set forth in the preceding paragraphs as if fully set forth herein.

45.     Following Defendant's acceptance and agreement to the Operative Agreement, Plaintiff submitted multiple new Qualified Opportunities to Defendant.

46.     Plaintiff's submission of new Qualified Opportunities following the execution of the Addendum was made in reliance upon Defendant's acceptance of new terms outlined in the Addendum.

47.     During the four-year period leading up to the instant dispute, Defendant accepted at least seven (7) new Qualified Opportunities/Clients from Plaintiff, accepted the benefits of Plaintiff's introduction of such Qualified Opportunities/Clients from Plaintiff, and paid commissions to Plaintiff in a manner consistent with the modified commission formula outlined in the Addendum.

48.     On April 8, 2024, almost four years after agreeing to the expanded payments provided for in the Addendum and delivering payments pursuant to the terms therein, Defendant's Chief Executive Officer, Scott Kenyon, emailed Plaintiff's Chief Financial Officer, Scott Pollov, seeking to "renegotiate" the Operative Agreement.

49.     Plaintiff ultimately declined Defendants invitation to "renegotiate" the terms of the Operative Agreement.

50.     On June 19, 2024, Defendant, though counsel, advised Plaintiff that it was repudiating its obligations under the Operative Agreement, stating that it would only pay commissions on Qualified Opportunities for a period of thirty-six (36) Billing Cycles, *i.e.* the commission period under the pre-Addendum Agreement.

51.     At the time Defendant repudiated its obligations under the Operative Agreement, Defendant was providing services to at least seven (7) Qualified Opportunities/Clients introduced to Defendant by Plaintiff pursuant to the Operative Agreement's terms.

52.     All of the Qualified Opportunities/Clients currently at issue between the Parties were submitted to Defendant after July 26, 2020, *i.e.,* the date on which the Parties executed the Addendum.

53.     At all times relevant to this dispute, Plaintiff had contractual relationships with other providers similar to Defendant that Plaintiff could have directed Qualified Opportunities/Clients to if Defendant had indicated that it was unwilling to agree to and accept the terms of the Operative Agreement.

54.     On or about June 19, 2024, in a letter[3] from Defendant's counsel, Ryan Botkin, to Plaintiff's Chief Financial Officer, Scott Pollov, Defendant purported to offer notice of its termination of the Operative Agreement between the parties and advised that Defendant would not honor the continuing payments expressly agreed to in the Addendum, instead stating it would pay only through the thirty-six (36) month term of the Agreement.

55.     On July 2, 2024, Plaintiff, through counsel, responded[4] to Defendant's June 19, 2024 repudiation correspondence.  In the response, Plaintiff specifically indicated its desire to avoid this litigation and demanded the following:

> In the interest of avoiding litigation, [Plaintiff] demands that [Defendant] retract its repudiation of its obligations under the Agreement and Addendum by July 17, 2024. If [Defendant] fails to confirm that it will honor the contractual obligations, including the term of commission obligations for Qualified obligations as set forth in the Addendum, [Plaintiff] intends to take steps to enforce its contractual rights.

---

[3] A true and accurate copy of the June 19, 2024 letter is attached hereto and incorporated by reference as *Exhibit 3* ("June 19, 2024 Letter").
[4] A true and accurate copy of the July 2, 2024 response is attached hereto and incorporated by reference as *Exhibit 4* ("July 2, 2024 Letter").

56.     On September 5, 2024, Plaintiff initiated this action, asserting claims for breach of contract and declaratory judgment arising from Defendant's express repudiation of its contractual obligations.

57.     Plaintiff decided to initiate the lawsuit after Defendant continued to repudiate its obligation(s) to pay commissions to Plaintiff under the terms of the Addendum.

58.     On October 14, 2024, after Plaintiff was forced to file the instant action, Defendant transmitted correspondence[5], wherein it stated that it had decided to "unconditionally retract its repudiation of the payment terms described in the Addendum."

59.     In that same written communication, Defendant stated that it "recognize[d] the effectiveness of the Addendum and will pay commissions under the Agreement 'for the duration of the relationship' for all existing clients, at currently-agreed rates consistent with the Addendum." (*See* ***Exhibit 5***).

60.     In discussions between the parties in and around December 2024 and January 2025, Defendant refused to expressly acknowledge the validity of the payment terms described in the Addendum.

61.     Based on information and belief, Defendant continues to receive revenue from Qualified Opportunities/Clients provided to Defendant by Plaintiff under the Operative Agreement.

<u>**COUNT I - BREACH OF CONTRACT**</u>

62.     Plaintiff adopts and incorporates by reference the facts and allegations set forth in the preceding paragraphs as if fully set forth herein.

---

[5] A true and accurate copy of Defendant's October 14, 2024 correspondence is attached hereto and incorporated by reference herein as ***Exhibit 5*** ("October 14, 2024 Letter").

63.     Through the Operative Agreement, Defendant agreed to pay Plaintiff commissions of at least fifteen percent (15%) on all revenues derived from Qualified Opportunities/Clients supplied by Plaintiff to Defendant.

64.     The Operative Agreement represents a valid contract between the Parties, supported by valuable consideration.

65.     Through the date of this filing, there are seven (7) Qualified Opportunities/Clients supplied by Plaintiff to Defendant with whom Defendant retains a relationship and for which commissions are owed to Plaintiff under the Operative Agreement.

66.     Defendant's communications further demonstrate its clear and unequivocal repudiation of its continuing monthly commission payment obligations to Plaintiff as agreed to in the Addendum.

67.     Based on information and experience, the annual commission value of these seven (7) Qualified Opportunities/Clients is in excess of five-hundred thousand dollars ($500,000.00) pursuant to the terms of the Operative Agreement.

68.     As a direct and proximate result of Defendant's breach and/or anticipated future breaches of its contractual duty to pay commissions under the Agreement and its Addendum, Plaintiff has been and will continue to be directly and proximately damaged in an amount in excess of $75,000.00 to be determined at trial.

69.     The amount owing to Plaintiff by Defendant is no less than all commissions due and owing to Plaintiff until the end of the relationship between Defendant and any Qualified Opportunity supplied by Plaintiff.

## COUNT II - DECLARATORY RELIEF

70.     Plaintiff adopts and incorporates by reference the facts and allegations set forth in the preceding paragraphs as if fully set forth herein.

71.     There exists an actual, definite, and concrete controversy between Plaintiff and Defendant regarding the validity of the Addendum and validity of commission payments owed by Defendant to Plaintiff beyond thirty-six (36) Billing Cycles.

72.     There also exists an actual, definite, and concrete controversy between Plaintiff and Defendant regarding the continuing validity of the limitation of liability provision of Section 10 of the Agreement despite the express modification of Agreement terms conflicting with the spirit of the Addendum.

73.     Defendant has expressly repudiated its obligation(s) to pay commissions on Qualified Opportunities/Clients pursuant to the terms of the Operative Agreement beyond thirty-six (36) Billing Cycles.

74.     Based on information and experience, the annual commission value of the Qualified Opportunities/Clients at issue is in excess of five-hundred thousand dollars ($500,000.00) pursuant to the terms of the Operative Agreement.

75.     Based on information and experience, the Qualified Opportunities/Clients at issue are expected to generate commissions in excess of five-hundred thousand dollars ($500,000.00) for years to come.

76.     This Court has jurisdiction over these disputes based on diversity of citizenship and it would not be an abuse of discretion to exercise jurisdiction over this matter.

77.     For the reasons stated above, Plaintiff requests an Order from this Court declaring that: (1) the Operative Agreement represents a valid and enforceable contract between Plaintiff

and Defendant, (2) Defendant must pay monthly commissions of at least fifteen percent (15%) for each Qualified Opportunity/Client provided by Plaintiff for the length of Defendant's relationship with such Qualified Opportunity/Client as agreed in the Addendum, and (3) Section 10 of the Agreement's limitation of liability provision does not limit Plaintiff's recovery in any fashion.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Accelerance, Inc. respectfully requests that the Court order relief, as follows:

1.  Actual, compensatory, and consequential damages, in an amount to be determined at trial, for all losses and damages suffered by Plaintiff due to the acts and transactions complained of herein;

2.  All costs and expenses, including attorneys' fees, incurred by Plaintiff in prosecuting this action as provided for under Sections 3 and 15 of the Parties' Agreement, a commercial contract under N.C. Gen. Stat. § 6-21.6;

3.  An Order declaring that: (1) the Operative Agreement represents a valid and enforceable contract between Plaintiff and Defendant; (2) Defendant must pay monthly commissions of at least fifteen percent (15%) for each Qualified Opportunity/Client provided by Plaintiff for the length of Defendant's relationship with such Qualified Opportunity/Client as agreed in the Addendum; and (3) Section 10 of the Agreement's limitation of liability provision does not limit Plaintiff's recovery in any fashion;

4.  Pre- and post-judgment interest as otherwise permitted by law and the contracts between the Parties;

5.  A trial by jury on all issues so triable; and

6.  Any other such relief this Court deems just and proper.

Respectfully submitted, this 12th day of February, 2025.

**WAGNER HICKS PLLC**

/s/ *Sean C. Wagner*
Sean C. Wagner, N.C. State Bar No. 50233
Meagan L. Allen, N.C. State Bar No. 54317
831 E. Morehead Street, Suite 860
Charlotte, North Carolina 28202
Telephone: (704) 705-7358
sean.wagner@wagnerhicks.law
meagan.allen@wagnerhicks.law

*ATTORNEYS FOR PLAINTIFF ACCELERANCE, INC.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send notification of filing to all parties receiving electronic service including the following:

Jason M. Fedo
GREENBERG TRAURIG, P.A.
777 South Flagler Drive, Suite 300 East
West Palm Beach, Florida 33401
(561) 650-7920
fedoj@gtlaw.com

Angelika Hunnefeld (*admitted pro hac vice*)
GREENBERG TRAURIG, P.A.
333 SE 2nd Avenue, Suite 4400
Miami, FL 33131
(305) 579-3782
hunnefelda@gtlaw.com

*Attorneys for APP SOLUTIONS INTERNATIONAL, INC.*

Respectfully submitted, this 12th day of February, 2025.

**WAGNER HICKS PLLC**

/s/ *Sean C. Wagner*
Sean C. Wagner

16